# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAMETRI DALE,                    )
                                 )
            Plaintiff,           )
                                 )
                                 )
    v.                           )          1:23CV373
                                 )
FNU BARNES, et al.,              )
                                 )
            Defendants.          )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the Motion for Summary Judgment brought by

Defendants Daniel Barnes, Valdris Brown, Kent Sampson, Christian Ransom, and Stephen

Jacobs.[1]  (Docket Entry 24.)  Plaintiff Dametri Dale has filed a Response in opposition as well

as documents in support including his own Affidavit and Declaration.  (Docket Entries 30, 31

and 32.)  The Court also has before it Defendants' Motion to Seal.  (Docket Entry 36).  The

matters are now ripe for disposition.  For the reasons stated below, the undersigned will

recommend Defendants' Motion for Summary Judgment be granted.  The Court further finds

the Motion to Seal should be granted in part and denied in part.

---

[1] In the Answer, Defendants state that Defendant Brown was incorrectly identified as Defendant
Jurnigan in the Complaint.  (Docket Entry 14 at 1.)  In her Declaration, Defendant Brown states
that her name is Valdris Brown and "previously/now known as Valdris Jernigan."  (Docket Entry
25-4 at 1.)  Throughout his Response Plaintiff refers to Defendant Brown, not Defendant Jurnigan.
(*See generally* Response, Docket Entry 30.)

## I. BACKGROUND

On or about May 1, 2023, Plaintiff, a prisoner of the State of North Carolina, filed a *pro se* Complaint against Defendants pursuant to 42 U.S.C. § 1983 alleging claims of excessive force and deliberate indifference to a medical condition, as well as asserting state law claims of assault and battery and intentional infliction of emotional distress. (*See* Complaint, Docket Entry 2.) Plaintiff's claims arise out of an incident that occurred at Scotland Correctional Institution ("Scotland") on or about April 18, 2023. (Docket Entry 30 at 2.) The Defendants are prison personnel serving in different capacities: Defendant Jacobs (Warden); Defendant Barnes (Correctional Lieutenant); Defendant Ransoms and Sampson (Correctional Officers); and Defendant Brown (Unit Manager).[2] (Docket Entry 2 at 3-5.)

Plaintiff alleges the incident occurred when he was being escorted from a mental health appointment back to his cell in the MCON unit by Defendants Ransom and Sampson.[3] He says that while being escorted he asked the officers to allow him to speak with a supervisor about a death in his family and an issue with legal materials. (Docket Entry 30 at 2.) Plaintiff states that when the officers refused his request, he "became filled with despair and immediately wanted to kill himself, which he verbally communicated to Defendants Ransom and Sampson." (*Id.*) He claims Defendant Sampson responded "you're gonna have to kill yourself in your cell," and continued to direct Plaintiff toward his cell. (*Id.* at 2-3.) Plaintiff says that Defendants Sampson and Ransom "attempted to force Plaintiff to his cell without

---

[2] All citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear in CM/ECF.

[3] MCON unit stands for "Modified Control" and is a housing unit for "inmates who have displayed behavioral problems." (Docket Entry 25 at 3.)

2

addressing the self-injurious behavior (i.e. suicide ideation)." (*Id.* at 3.) He says he pulled away and started to yell, "SIB" and that he wanted to kill himself. (*Id.*) He states that "Defendant Ransom then pulled out his paton [*sic*] and placed it in between Plaintiff's right arm. The paton [*sic*] then slips and jams in between Plaintiff's wrist and in the middle of the handcuffs." (*Id.*) Plaintiff told Defendant Ransom he was going to "break his wrist" and Plaintiff said Defendant Ransom responded he would "break your [expletive deleted] wrist." (*Id.*) Plaintiff says when Defendant Brown came out of her office, he told her he needed to speak with her about a death in his family and that Defendants Ransom and Sampson "were mad because he told them that he wanted to kill himself." (*Id.*) Plaintiff states that Defendant Brown ordered Defendants Ransom and Sampson to return Plaintiff to his cell. (*Id.*)

Officer Sanderson, became aware of the situation and called a Code Seven which caused other correctional officers to respond to the area.[4] (*Id.* at 3-4.) Plaintiff says that as the other officers responded, Defendant Ransom replaced his paton [*sic*], but "prior to entering G-Block, Defendant Ransom began to knee the Plaintiff." (*Id.* at 4.) While in his cell in G-Block, Plaintiff asserts that Defendant Barnes "pulled out his taser and threaten [*sic*] to taser Plaintiff." (*Id.*) Plaintiff says that during all these events he was restrained in handcuffs behind his back. (*Id.*) Although Plaintiff acknowledges he was medically evaluated later that same day he claims that medical staff did not "take any action with regard to Plaintiff's psychological state." (*Id.*) As Plaintiff notes, the incident was captured on surveillance cameras, although

---

[4] Officer Sanderson is not named as a defendant in this action.

3

the video only captures the images, not sound. The surveillance video has been provided to the Court by Defendants. (*See* Docket Entry 25-1, Exhibit C.)

Based upon a thorough review of the Complaint, Plaintiff alleges an excessive force claim against Defendant Ransom, and a claim that Defendants Ransom, Sampson, and Brown acted with deliberate indifference to his medical needs by not properly responding to his statements indicating he wanted to engage in self-injurious behavior. (Docket Entry 2 at 8.) In addition, Plaintiff alleges state law claims of assault against Defendants Ransom and Barnes (*Id.* at 8) and claims of battery and intentional infliction of emotional distress against Defendant Ransom. (*Id.* at 8-9.) He claims that because of Defendants' actions he had "bruises to his left and right wrists and to his right arm." (*Id.* at 9.) He says he also suffered "emotional harm." (*Id.*) Plaintiff has sued Defendants in their official and individual capacities. (*Id.* at 3-5.) He seeks monetary damages as well as declaratory and injunctive relief. (*Id.* at 10.)

On October 6, 2023, Defendants filed an Answer to the Complaint. (Docket Entry 14.) After the discovery period ended, Defendants filed the Motion for Summary Judgment currently before the Court along with a Memorandum, Declarations, video footage, and other documents in support. (Docket Entries 24, 25.) On July 15, 2024, Plaintiff filed a Response in opposition to the Motion for Summary Judgment along with his own Affidavit, Declaration, and documents in support. (Docket Entries 30-32.) Defendants' Motion for Summary Judgment is now ripe for ruling.

## II. DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick*

*v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must affirmatively demonstrate there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49. Moreover, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252.

Case 1:23-cv-00373-TDS-JLW   Document 37   Filed 10/04/24   Page 5 of 33

Defendants move for summary judgment on several grounds. First, insofar as Plaintiff has sued them in their official capacity, Defendants contend they are entitled to sovereign immunity. (Docket Entry 25 at 7.) Second, Defendants argue Defendant Jacobs lacks any personal involvement in any of the alleged violations. (*Id.* at 9-10.) Third, Defendants argue Plaintiff cannot show they used excessive force. (*Id.* at 10-14.) Fourth, Defendants assert Plaintiff is unable to show they acted with deliberate indifference to his medical conditions. (*Id.* at 14.) Fifth, Defendants assert the evidence in the record conclusively shows Plaintiff is unable to establish Defendants committed assault and battery or intentional infliction of emotional distress. (*Id.* at 16-17.) Defendants also argue that if the Court grants summary judgment on the constitutional claims, the Court should decline to exercise supplemental jurisdiction over the state law claims. (*Id.* at 20-21.) Sixth, Defendants assert they are entitled to qualified immunity. (*Id.* at 18-20.)

## Sovereign Immunity

The Court first considers Defendants' argument the claims against them in their official capacities are barred by sovereign immunity. (*Id.* at 7-9.) The Eleventh Amendment prohibits actions in federal court against a state unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th Cir. 2003). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). It follows that just as "the Eleventh Amendment bars a damages action against a state in federal court," it also bars suit against state officials in their official capacity. *Kentucky v. Graham*, 473

6

U.S. 159, 169 (1985). However, Eleventh Amendment immunity is not absolute. "[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). However, for a court to award injunctive relief there must be an "ongoing violation of federal law." *See DeBauche v. Trani,* 191 F.3d 499, 504-05 (4th Cir. 1999) (holding that Eleventh Amendment barred declaratory and injunctive relief when no ongoing violations of federal law were alleged.)

Here, all the Defendants are employees of the State of North Carolina and immunity has not been waived. Therefore, to the extent Plaintiff sues Defendants in their official capacities and seeks monetary damages, sovereign immunity precludes the action. Plaintiff's claims for injunctive relief against them in their official capacities also fail. Plaintiff's claims arise out of his interactions with Defendants in April of 2023, and he does not allege any ongoing violations. Without an allegation or evidence the conduct is ongoing, injunctive relief is barred. *See DeBauche*, 191 F.3d at 504-05. Moreover, in his Response to the Motion for Summary Judgment, Plaintiff states he has no objection to the Court granting summary judgment on the official capacity claims. (Docket Entry 30 at 6.) Therefore, the Motion for Summary Judgment should be granted on the claims against Defendants in their official capacities.

### Defendant Jacobs

Plaintiff names Stephen Jacobs, the Warden of Scotland, as a Defendant. (Docket Entry 2 at 5.) Defendants assert Defendant Jacobs is entitled to summary judgment because he did not have any personal involvement in the incidents giving rise to the claims. "To

establish individual liability under § 1983, a plaintiff must affirmatively show the 'official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Hill*, No. 1:03-CV-109, 2004 WL 1618591, at *4 (M.D.N.C. July 16, 2004) (citing *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)).

In his Complaint, Plaintiff states only that "Defendant, Stephen Jacobs, is the Warden of Scotland Correctional Institution. He is legally responsible for the operation of Scotland Correctional Institution and for the welfare of all the inmates at Scotland Correctional Institution." (Docket Entry 2 at 7.) Therefore, Plaintiff fails to even assert Defendant Jacobs had any personal involvement that would give rise to liability. Nor can Plaintiff succeed insofar as he is alleging Defendant Jacobs is liable based on his supervisory role.

A theory of *respondeat superior* is generally inapplicable to § 1983 suits. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Shaw v. Stroud*, 13 F.3d 791, 798-99 (4th Cir. 1994). A supervisor may be liable for the actions of a subordinate if:

> (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
> (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and
> (3) there was an "affirmative causal link" between the supervisor's inaction and the constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Plaintiff does nothing more than identify Defendant Jacobs as the Warden and argue he is responsible for all that goes on at Scotland. Plaintiff has not presented any allegations tying Defendant Jacobs to the events underlying the claims or indicating he had actual or constructive knowledge of the conduct. Viewing the

8

information in the light most favorable to Plaintiff, there is no genuine issue of material fact that could support liability against Defendant Jacobs. Moreover, in the Response Plaintiff states he "will not object to dismissing Defendant Jacobs." (Docket Entry 30 at 6-7.) Consequently, Defendants' Motion for Summary Judgment should be granted insofar as Defendants seek to have the claims against Defendant Jacobs dismissed.

## Excessive Force

Plaintiff asserts that Defendant Ransom used excessive force against him when Ransom engaged his baton to try to force Plaintiff toward his cell and when he kneed Plaintiff prior to entering G-block.[5] (Docket Entry 2 at 8; Docket Entry 31 at 3.) The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (internal quotation omitted). When evaluating an excessive force claim, the Court "must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 98 (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). To make this determination, the Court considers two elements: "whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation

---

[5] In the Complaint Plaintiff states that Defendant Ransom intentionally caused bodily harm because he was "kicking and kneeing him," (Docket Entry 2 at 8), but it appears he is abandoning his assertion that he was kicked. In the Response to Summary Judgment he does not mention kicking but only states that "[p]rior to entering G-block, Defendant Ransom began to knee the Plaintiff." (Docket Entry 30 at 4.) Similarly, in his affidavit he does not claim he was kicked, and he does not present any other evidence to support the claim. (Docket Entry 31.) Without any evidence Plaintiff cannot sustain a claim that Defendant Ransom kicked him. *See Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir. 1996) (a party opposing summary judgment may not rest on "unsupported assertion".)

suffered, or injury inflicted on the inmate was sufficiently serious (objective component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008).

The Supreme Court has set forth a list of non-exclusive factors to assist courts in determining whether an officer has acted with a culpable state of mind: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko*, 530 U.S. at 239 (citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986)) (internal quotations omitted). The objective component focuses not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (citing *Hudson*, 503 U.S. at 7). The Eighth Amendment "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (internal quotation and citation omitted). "Prison officials are given a certain amount of discretion in decisions to use force" because "they are frequently called upon to maintain order, quell disturbances, and act in haste, under pressure." *Geddings v. Roberts*, 1:15cv264, 2018 WL 1626116, at *9 (M.D.N.C. Mar. 30, 2018) (internal citations and quotations omitted).

Defendants argue that summary judgment is appropriate on the excessive force claim because Plaintiff cannot show either the subjective or the objective component with respect to Defendant Ransom or any other Defendant. (Docket Entry 25 at 10.) Defendants contend that the information in the record supports only that any force was de minimis and applied with a good faith intent to gain Plaintiff's compliance and get him to return to his cell. (*Id.* at

10

10-14.) Defendant asserts that the baton was used to apply a side arm lock to try to get control. (*Id.* at 4.) They argue no additional force was used. (*Id.*)

<u>Evidence Going to Excessive Force</u>

<u>Plaintiff's Affidavit</u>

Plaintiff has filed an Affidavit in support of his Response to the Motion for Summary Judgment.[6] (Docket Entry 31.) In the document, he states that "[b]oth Defendants refused to let me speak with a supervisor, at which time I just felt hopeless and became emotional and wanted to kill myself." (*Id.* at ¶ 5.) He says that Defendant Sampson told him "I would have to kill myself in my cell." (*Id.*) He says that Defendants "grabbed me attempting to take me to my cell, at which time, I pulled back and began yelling 'SIB' and that "I want to kill myself.'" (*Id.*) He says that Defendant Ransom "pulled out his Paton [*sic*] and placed it in between my right arm. The paton [*sic*] then slipped in between my wrist and in the middle of the handcuffs." (*Id.*) He says he yelled in pain and when he told Ransom he was going to break Plaintiff's wrists, he says Ransom told him "he would break my [expletive deleted] wrists." (*Id.*) Plaintiff also claims that before entering G-block "Defendant Ransom began to knee me. However, he was stopped by other officers." (*Id.*)

---

[6] This is the only evidence of the events provided by Plaintiff in support of his claims. Plaintiff references Offender Keshawn Blunt and Offender Wallace Belfield as possible witnesses on his behalf, (Docket Entry 30 at 12), but Plaintiff has not submitted affidavits or declarations from these parties. Moreover, with respect to Inmate Belfield's statement given as part of the prison incident investigation, he asserts Officer Sampson was "beating" Plaintiff and "kick[ed] him in the face." (Docket Entry 30-1 at 4). This version of events is not asserted by Plaintiff and would be unhelpful as it is clearly contradicted by the video evidence. *See Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)) ("When a video 'quite clearly contradicts the version of the story told . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'").

<u>Defendants' Declarations</u>

Defendants' accounts of the incident correspond with Plaintiff's account in many respects. The main difference involves what was said between Plaintiff and Defendants, and whether Defendant Ransom kneed Plaintiff. According to the Declarations of Defendants Sampson and Ransom, the officers were escorting Plaintiff back to his cell after a medical appointment. Plaintiff was given an order to go to his cell and he refused and said "y'all gonna have to make me cause I ain't going nowhere." (Docket Entries 25-2 at ¶ 3; 25-3 at ¶ 3). Defendant Sampson said Plaintiff attempted to pull away from Defendant Sampson's grip, and Officer Ransom then started to assist to help get control. (Docket Entry 25-2 at ¶ 3.) Defendant Sampson said he placed his arm through Plaintiff's left arm and placed it on his shoulder and "Officer Ransom and I then placed Inmate Dale against the holding cell to gain control of him. Officer Ransom then used a support side armlock to gain Inmate Dale's compliance with the orders to walk back to his cell." (*Id.*) A Code 7 was called and other staff members arrived to provide additional security. (*Id.*) Defendant Ransom's Declaration provides the same factual account. (Document Entry 25-3 at ¶ 3.) Both men said no more force was used than necessary to deal with "Inmate Dale's resistant and combative behavior." (Docket Entries 25-2 at ¶ 4; 25-3 at ¶ 4.) Defendants Ransom and Sampson deny they kneed, kicked or beat Plaintiff, and never saw any other staff member do so. (Docket Entry 25-3 at ¶ 4; Docket Entry 25-2 at ¶ 4.)

Defendant Barnes was one of the officers who responded to the Code 7. He said that "Inmate Dale was refusing to walk, resisting staff, and being combative." (Docket Entry 25-5 at ¶ 3.) He said he never witnessed any staff use more force than necessary given Plaintiff's

resistance and he "never saw any staff member beat, kick, knee or assault Inmate Dale, as he alleged in his Complaint." (*Id.* at ¶ 4.)

Defendant Brown, a Unit Manager at Scotland, indicated she responded to the Code Seven involving Plaintiff on April 18th. (Docket Entry 25-4 at ¶¶ 2-3.) She said that by the time she became involved Plaintiff was being escorted to his cell and "refusing to walk, resisting staff, and being combative." (*Id.* at ¶ 3.) She never saw any staff member "beat, kick, knee, or assault Inmate Dale, as he alleged in his Complaint." (*Id.* at ¶ 4.)

Prison Surveillance Video

The record before the Court includes six short videos of the incident from several different cameras within the facility.[7] (Docket Entry 25-1, Exhibit C.) The videos do not have sound. The footage captures the events leading up to Defendant Ransom engaging his baton. (*Id.*, C171 starting at 2:44:39 pm). The videos also show as other correctional staff members respond to the situation, Plaintiff being walked to his cell, and Plaintiff being placed into his cell. (*Id.*, C172, C173, C174, and C193.) A final video shows Plaintiff being escorted by officers down a hallway about 15 minutes after he was placed in his cell. (*Id.*, C171 video starting at 3:02:41 p.m.)

Analysis of Excessive Force Claim

Plaintiff argues that "to use a paton [*sic*] on Plaintiff for merely asking to speak with a supervisor and for stating that he wanted to kill himself, is extreme and outrageous." (Docket Entry 30 at 19.) Plaintiff also contends that he "never refused to go back to his cell." (Docket Entry 30 at 8.) While the court must infer the facts favorably to Plaintiff, the non-moving

---

[7] Plaintiff's Response indicates he has had access to the video evidence. (Docket Entry 30 at 3-4.)

party, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *but see also Alexander v. Connor*, 105 F.4th 174, 179 (4th Cir. 2024) (cautioning the courts not to draw inferences and to only rely on video to discount a plaintiff's account when the video shows it is clearly false.). Plaintiff's claims that he never refused to go to his cell and that force was used merely in response to his request are clearly contradicted by the video and need not be accepted by the Court. The video depicts Plaintiff pulling against the officers and planting his feet as they attempt to move him forward. Further, the video clearly reflects that Defendant Ransom engaged his baton only after Plaintiff physically struggled against the officers and resisted walking to his cell.

Moreover, a consideration of the *Whitley* factors demonstrates the force was not employed maliciously or sadistically to cause harm, but in a good faith effort to get Plaintiff to return to his cell. First, there was a need for the application of force. Plaintiff by his own account concedes that when the officers tried to take him to his cell he pulled back. (Docket Entry 31 at ¶ 5). Courts "owe officers wide-ranging deference in their determinations that force is required to induce compliance with policies important to institutional security." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019) (quotations omitted). "Corrections officers act with permissible motive not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." *Freeman v. Deas*, No. 20-7345, 2023 WL 8230805, at *2 (4th Cir. Nov. 28, 2023) (quotations and citation omitted). The evidence demonstrates that Defendant Ransom

14

only used his baton after Plaintiff physically struggled against the officers. Under these circumstances it was reasonable for Defendant Ransom to use force for the security of the officers and to maintain order of the prison environment.

Next, the Court considers "the relationship between the need and the amount of force that was used" and "the extent of any reasonably perceived threat that the application of force was intended to quell." *Iko*, 535 F.3d at 239. These factors also weigh in Defendant Ransom's favor. Although the situation escalated quickly, it was only after the initial attempts to control Plaintiff with his hands failed that Defendant Ransom engaged his baton to place Plaintiff in an arm lock. Although Plaintiff argues he was restrained in handcuffs and such force was not necessary, even with the handcuffs the officers were having difficulty getting him to comply as he resisted returning to his cell. In addition, the record reflects that Plaintiff had many prior disciplinary incidents including for assaulting staff with a weapon and disobeying orders. (Docket Entry 25-1 at 6.) In this situation, it was appropriate for Defendant Ransom to want to get control of Plaintiff quickly and to use his baton to do so. *See Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984); *see, e.g., Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation" and courts must consider that when determining whether a constitutional violation occurred.); *Grayson v. Peed*, 195 F.3d 692, 696-97 (4th Cir. 1999) ("If we failed to accord due deference to the officers' efforts [to restrain a combative prisoner], we would give encouragement to insubordination in an environment which is already volatile enough."), abrogated on other grounds by *Short v. Harman*, 87 F.4th 593 (4th Cir. 2023).

15

The final factor, the effort made to temper the response, also weighs in Defendant Ransom's favor. Plaintiff acknowledges that once Defendants Sampson and Ransom received backup from other officers, the baton was withdrawn. (Docket Entry 30 at 4.) This video indicates that less than two minutes from the start of the incident, Defendant Ransom was no longer using the baton, and Plaintiff was being walked to his cell by officers who were only using their hands. (*See* Docket Entry 25-1, Exh. C, C173 starting at 2:45:31 p.m.) Therefore, the evidence demonstrates Defendant Ransom used the baton only to the extent necessary to gain control and discontinued its use as soon as safety and compliance could be ensured in another manner.

Plaintiff asserts the video evidence is not conclusive because it does not have sound. In particular, he asserts it does not clarify Defendant Ransom's statements. Plaintiff says that after the baton slipped, he yelled, and told Defendant Ransom he was going to break Plaintiff's wrists. He alleges that Defendant Ransom responded, "he would break my [expletive deleted] wrists." (Docket Entry 31 at ¶ 5.) Plaintiff argues this shows Defendant Ransom was using the baton maliciously and sadistically to cause harm. Defendant disputes this account. As Plaintiff indicates, without sound the video does not clarify the record insofar as the parties disagree on what was said and by whom. However, it is well established that not every factual dispute precludes summary judgment. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In this instance, the disagreement over what was said does not present an issue of material fact. All the evidence, including Plaintiff's own affidavit, shows the baton was engaged only after Plaintiff was physically resisting. The uncontroverted

evidence also shows the baton was used to try to place Plaintiff in an arm lock and withdrawn once the officers gained control of the situation. Even when Plaintiff characterizes the incident, he says the baton "slipped" and jammed his wrist. (Docket Entry 31 at ¶ 5.) This describes an accident, not an intent to cause harm.

Moreover, while the Supreme Court has established that the analysis of an excessive force claim examines the amount of force used, not the extent of injury, injuries may be relevant insofar as they "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37. The medical records from Plaintiff's visit to staff shortly after the incident indicate that Plaintiff explained he was in handcuffs and when they turned him with the baton something popped in his right wrist. (Docket Entry 25-1 at 43.) The medical records indicate that while Plaintiff claimed numbness in his right hand, he reacted to stimuli and touches, and the provider notes indicate "offender not showing the level of pain that he is stating look at vitals and by his distress level on his face." (*Id.*) The report noted that while he claimed a pain of ten out of ten, he was not "pulling away from the exam" as his wounds were examined and "no guarding and vitals all within normal limits." (*Id.* at 45.) The records indicating minimal injury aligns with all the evidence showing that any force used on Plaintiff was with an intent to gain control and return him to his cell, not to cause harm. Therefore, even assuming Plaintiff can show that in the heat of the moment Defendant Ransom said the words Plaintiff contends, a reasonable jury could not conclude Defendant Ransom applied the force maliciously and sadistically with an intent to cause harm, rather than with an intent to restore discipline, and summary judgment is appropriate on this claim. *See Whitley*, 475 U.S. at 322 ("Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will

17

support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury.")

Lastly, the Court considers Plaintiff's claim Defendant Ransom kneed him before they entered the G-block. In support, Plaintiff has submitted his affidavit in which he states that "[p]rior to entering G-block, Defendant Ransom began to knee me. However, he was stopped by other officers." (Docket Entry 31 at ¶5.) Plaintiff does not provide any additional description or evidence in support of this claim. Defendants deny that Defendant Ransom kneed Plaintiff or used any such force against him. The video evidence does not show Defendant kneeing Plaintiff, but it is not clear it captures the complete interaction between the parties. There is, therefore, a factual dispute on this point which must be resolved in Plaintiff's favor. However, "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. 1, 9 (1992) (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") "An inmate who complains of a 'push or a shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9); *see also Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016).

Plaintiff alleges only that Defendant Ransom "began to knee me" but was stopped, and he does not claim any injury or consequence from this alleged contact. In a statement given the day after the incident, Plaintiff never claimed to have been kneed or kicked. (Docket Entry 30-1 at 2.) Nor did Plaintiff mention being kneed when he was examined by medical staff less than 20 minutes after the incident or indicate that he needed to be examined on that basis.

18

(*See* Docket Entry 25-1 at 43-45.) He only alleged discomfort to his arms and wrists from the use of the baton. Consequently, at best what Plaintiff has presented is an allegation of de minimis force, which while perhaps improper, cannot support a finding of excessive force.

Accordingly, for the reasons discussed, no reasonable jury could conclude the use of the baton or any other action by Defendant Ransom was excessive force in violation of the Eighth Amendment, and Defendants' Motion for Summary Judgment should be granted on the excessive force claim.

**Bystander Liability**

In his Response to the Motion for Summary Judgment, Plaintiff asserts the Defendants other than Defendant Ransom are liable because of their "failure to act, knowing that Defendant Ransom was violating Plaintiff's Constitutional and Individual Rights, had reasonable opportunity to prevent the violations and harm, and chose not to act." (Docket Entry 30 at 23-24.) This appears to be a bystander liability claim against Defendants Sansom, Brown and Barnes, for their failure to intervene when Defendant Ransom was allegedly using excessive force.

The Complaint does not allege bystander liability and to the extent Plaintiff is seeking to add a claim in his Response to Summary Judgment he may not do so. *See Southern Walk at Broadcast Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013); *see also Lassiter v. New York Yankees P'ship*, No. 1:18CV1029, 2019 WL 2210803, at *3 (M.D.N.C. May 22, 2019) (determining *pro se* litigant could not amend his complaint "through briefing or oral advocacy").

In any case, Plaintiff cannot establish bystander liability against Defendants. The Fourth Circuit has held that "bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (4th Cir. 2002). Thus, "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204 (footnote omitted).

Here, as discussed above, there is no constitutional violation with respect to Defendant Ransom's treatment of Plaintiff in trying to gain control of him and get him to return to his cell. With no underlying constitutional violation bystander liability must fail. *See id.*; *see also Dodson v. Prince George's Cnty.*, No. JKS 13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) ("Because the excessive force claim fails, the failure to intervene claim also fails."); *see also Marshall v. Odom,* 156 F. Supp. 2d 525, 531 (D. Md. 2001) ("In the absence of any underlying use of excessive force against the Plaintiff, liability cannot be placed on ... Officer Tindal for failing to intervene...."); *see also Hinkle v. City of Clarksburg, W. Va.,* 81 F.3d 416, 420–21 (4th Cir. 1996) (holding that a claim for bystander liability was inapplicable when a jury rejected the plaintiff-appellant's claim of excessive force).

## Deliberate Indifference to a Medical Condition

The Court next turns to Plaintiff's claims that his Eighth Amendment rights were violated because Defendants Ransom, Sampson, Brown, and Barnes all heard him say he wanted to kill himself and engage in self-injurious behavior but did nothing in response and returned him to his cell. (Docket Entry 2 at 8; Docket Entry 30 at 14-17.)

20

It is well established that not "every claim by a prisoner that he has not received adequate medical treatment states a [constitutional] violation." *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). To succeed on a claim, Plaintiff must show Defendants acted with "'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." *Iko*, 535 F.3d at 241 (quoting *Estelle*, 429 U.S. at 104). Regarding the objective component, a medical need is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted). As for the subjective component, a defendant is deliberately indifferent if he or she knew that an inmate faced a risk of harm due to a serious medical need and the defendant's "actions were insufficient to mitigate the risk of harm to the inmate arising from [that] medical need[ ]." *Id.* (emphasis and internal quotation marks omitted); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that the official knew of and disregarded an excessive risk to inmate health or safety.") (internal quotations omitted). This standard is more than mere negligence, requiring actual knowledge by the defendant of his own recklessness. *Farmer v. Brennan*, 511 U.S. 825, 835-36. "Prisoners' rights to adequate medical care related to prisoners' physical and mental health claims are identical." *DePaola v. Schilling*, No. 7:15CV00403, 2019 WL 3417359, at *7 (W.D. Va. Mar. 18, 2019) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)).

A prison official can act with deliberate indifference if he intentionally denies or delays access to medical care or intentionally interferes with prescribed treatment. *See Estelle*, 429 U.S. at 104-05; *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) ("unusual length of the

delay provides a reasonable basis for the inference" of deliberate indifference to a serious medical need). For a delay in treatment to rise to deliberate indifference, the Fourth Circuit has held the delay must result in "some substantial harm to the patient" such as noticeable exacerbation of the prisoner's medical condition or "frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745 (4th Cir. 2018) (quotations omitted).

Plaintiff asserts he informed not only Defendants Ransom and Sampson, but also other staff that he wanted to kill himself. (Docket Entry 30 at 14.) He contends that "clearly, if an offender verbally, or physically, communicates or demonstrates self-injurious behavior, a staff, whether officer or otherwise, has a duty to keep the offender under constant supervision until evaluated." (*Id.* at 15.) He argues that because "Defendants did not get Plaintiff to mental health professionals, they failed to complete their duties and were deliberately indifferent." (*Id.* at 17.) Plaintiff also includes information about being placed on suicide watch a week later. He states that on April 25, 2023, after he had "continually informed several staff members that he wanted to kill himself" another offender told one of the prison psychologists who then had Plaintiff pulled out of his cell for assessment. (*Id.* at 4-5.) According to Plaintiff, he was placed on "self-injurious precautions" after speaking to mental health staff. (*Id.* at 5.)

Defendants state that after the incident on April 18th, once Plaintiff calmed down, he was taken back to the medical area to be evaluated. (Docket Entry 25 at 5.) According to Defendants, at that time Plaintiff complained about wrist pain, but did not report he wanted to engage in self-injurious behavior or any other problems. (*Id.*) With respect to Plaintiff's claims about being placed on suicide precautions on April 25, 2023, Defendants state that Plaintiff was placed on the precautions due to his self-reports. (*Id.*) They note that according

22

to the medical records, the next day Plaintiff requested to be removed from the precautions and said he "declared SIB because he was concerned about his family and was not given a phone call." (*Id.*; Docket Entry 25-1 at 48.)

Plaintiff acknowledges he was medically evaluated after the incident on April 18th. He says the medical staff asked what happened, and he explained he "was in a state of despair momentarily, and had told staff that he wanted to kill himself." (Docket Entry 30 at 4.) He says he told the medical staff about the injury to his wrist, and the medical staff "merely checked Plaintiff's vitals and provided alcoholic wipes so that Plaintiff could clean the blood from his wrists and forearm. At no time did medical staff take any action with regard to Plaintiff's Psychological State." (*Id.*)

Plaintiff is unable to show a serious medical need to which the officers were deliberately indifferent. At the time of the incident in question, Plaintiff was coming from a mental health evaluation and had been released by medical personnel to return to his cell. (Docket Entry 25-1 at 40.) It was just moments after that assessment that Plaintiff claimed he was going to engage in self-injurious behavior and only after he was denied his request to speak with a supervisor. Even if Plaintiff yelling S.I.B. alerted Defendants that Plaintiff presented a true risk of serious risk of harm, there is no evidence they disregarded his medical needs. "Once prison officials are aware of a serious medical need, they only need to 'respond[ ] reasonably to the risk.'" *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (quoting *Farmer*, 511 U.S. at 844). Here, there is no evidence Defendant did not respond reasonably. To the contrary, the undisputed evidence in the record indicates Defendants took appropriate steps to have Plaintiff evaluated almost immediately after the use of force incident. Plaintiff was placed in

his cell for a brief period to allow him to calm down and deescalate the situation, but then he was taken for medical care. The records show he was assessed around 20 minutes after the Code 7 was called over the incident. (Docket Entry 25-1 at 9, 16, 43-45.)

Although Plaintiff asserts he should not have been returned to his cell and should have immediately been taken to a supervisor or for evaluation, the Fourth Circuit has refused to impose liability simply because a defendant "took less action than he could have" even when the jail has knowledge an inmate has self-injurious thoughts. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). Moreover, Plaintiff does not assert, let alone provide evidence to establish, that his alleged mental health condition was negatively impacted by the minimal delay.[8] Even if he could show Defendants delayed seeking treatment for him, he is unable to establish any omission or delay was harmful enough to amount to deliberate indifference. *See Formica*, 739 F. App'x at 755.

Plaintiff argues he was only seen by "medical with regards to his physical injuries, not his psychological state." (Docket Entry 30 at 16.) However, to the extent he contends once he was seen by medical personnel they did not adequately address his mental health, Plaintiff cannot establish deliberate indifference against Defendants. Defendants are correction officers, not medical personnel. As Defendants assert, by ensuring Plaintiff was brought to medical personnel for treatment, they had satisfied their duty with respect to Plaintiff's medical needs. *Iko*, 535 F.3d at 242 (holding that once a prisoner is brought to receive care from medical personnel, "'a nonmedical prison official will generally be justified in believing that

---

[8] There is no indication in the medical records that Plaintiff reported any thoughts of self-harm at the time he had access to medical help and was medically evaluated. (Docket Entry 25-1 at 43-45.)

the prisoner is in capable hands'" (quoting *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004))). "The bottom line is that prison officials without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." *Pulliam v. Super. of Hoke Correct.*, 1:05CV1000, 2007 WL 4180743, at *6 (M.D.N.C. Nov. 20, 2007) (unpublished).

Lastly, insofar as Plaintiff argues that Defendants deviated from prison policy by returning him to his cell after his claims of self-injurious behavior, he is unable to show deliberate indifference in violation of the Eighth Amendment. Even if he could show Defendants failed to follow prison policy, a violation of policies alone does not establish a cause of action under § 1983. *See Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir.1990) (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir.1983)) ("[A] failure to carry out established procedures, without more, does not constitute 'deliberate disregard for the possibility' that [the detainee] 'would take his own life.'")

Accordingly, there is no evidence upon which a reasonable jury could conclude Defendants' conduct with respect to Plaintiff's mental health rises to the level of deliberate indifference to a medical need. Defendant's Motion for Summary judgment should be granted on the claim of deliberate indifference.

## Qualified Immunity

Defendants also contend summary judgment should be granted because that they have qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages

25

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]" (emphasis added)). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 546-47 (4th Cir. 2010) (citation omitted). In evaluating qualified immunity, a court initially may determine whether the plaintiff has alleged or shown a violation of a constitutional right at all. *See Pearson v. Callahan*, 555 U.S. 223 (2009). Further, "[b]ecause qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged." *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).

As discussed above, Plaintiff is unable to demonstrate a violation of his constitutional rights by any of the Defendants. Therefore, the undersigned concludes Defendants are entitled to qualified immunity as to Plaintiff's claims against them. *See Abney v. Coe,* 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there"); *Parker v. Burris,* 2015 WL 1474909, at *8 (M.D.N.C. Mar. 31, 2015) (finding that "the absence of evidence supporting a finding that a constitutional violation occurred satisfies the first prong of

the qualified immunity analysis"), *report and recommendation adopted*, No. 1:13CV488, 2015 WL 2169148 (M.D.N.C. May 8, 2015), *aff'd*, 623 F. App'x 82 (4th Cir. 2015).

### State Claims

In the Complaint, Plaintiff brings state law claims arguing Defendants Ransom and Barnes are liable for assault and battery and intentional infliction of emotional distress. (Docket Entry at 2.) As discussed above, the undersigned recommends granting Defendant's Motion for Summary Judgment on all the federal claims. Having determined all the federal claims should be dismissed, the undersigned recommends the Court decline to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3) (the district courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction.); *see also Ratcliff v. Baltimore Cty. Police Dep't*, No. CV GLR-18-1650, 2019 WL 3588317, at *9 (D. Md. Aug. 6, 2019) (unpublished) ("because the Court will dismiss all of [plaintiff's] § 1983 claims—the claims over which it has original jurisdiction—the Court declines to exercise supplemental jurisdiction over his state law claims."); *Mccants v. Berringer*, No. 1:17CV935, 2020 WL 4586786, at *3 n.4 (M.D.N.C. Aug. 10, 2020) (unpublished) (declining jurisdiction of state law negligence claim).

## III. MOTION TO SEAL

Defendants originally filed their Memorandum in support of Motion for Summary Judgment and all the related documents under seal (Docket Entry 25) but did not file a motion to seal as required by the local rules. *See* Local Rules 5.4, 5.5. In a Text Order entered on August 27, 2024, the Court ordered Defendants to "file a motion to seal identifying those documents therein which they believe need to be sealed and to support the need to seal in

27

accordance with Local Rule 5.4(c). (*See* Text Order dated 8/27/2024.) In response, on September 17, 2024, Defendants filed a motion entitled "Motion to Seal Memorandum in Support of Defendant's Motion for Summary Judgment." (Docket Entry 36). Along with the motion, the Defendants filed an unsealed but redacted copy of their Memorandum and documents in support. (Docket Entry 34.) Defendants also filed unredacted copies of the Memorandum and documents in support under seal. (Docket Entry 35.) From these filings, it appears Defendants are seeking to seal all the submitted medical records (Docket Entry 34-1, Exh. F at 38-53), the entirety of the prison incident report and witness statements (Docket Entry 34-1, Exh. E at 9-37), and portions of the Memorandum in support of Summary Judgment referring to Plaintiff's medical records or mental health condition. (Docket Entry 34 at 2, 5, 15-17.) There has been a reasonable opportunity for any interested parties to address the matter. Plaintiff has not responded to or joined in the Motion to Seal, nor has any other party filed a response.

Defendants assert that Plaintiff's confidential medical records and prison incident report need to be sealed because the records are "protected by state and/or federal law." (Docket Entry 36 at 2.) Defendants further contend that because these documents are discussed in the Memorandum, the Memorandum should be sealed as well. (*Id.*) Defendants cite to N.C. Gen. Stat. 122C-52 and to HIPAA privacy rules, 45 C.F.R. § § 1320d *et seq.*, with respect to the healthcare information. (*Id.* at 2-3.) With respect to the prison records, Defendants cite to *Gobble v. Bounds*, 13 N.C. App. 579, 186 S.E.2d 638, *aff'd*, 281 N.C. 307, 188 S.E.2d 347 (1972), and N.C. Gen. Stat. §§ 132-1.7, 148-74, and 148-76.

28

Because Defendants' Memorandum and Plaintiff's medical and prison records are submitted in connection with the Motion for Summary Judgment, the documents are judicial records, and the right of access is protected under the First Amendment. *Doe v. Pub. Citizen*, 749 F.3d 246, 267-68 (4th Cir. 2014). Therefore, the granting of a motion to seal is proper only when a compelling government interest is shown, and the sealing of the documents is narrowly tailored to meet the compelling interest. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988) (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984)). In considering the issue, the court must:

> [W]eigh the appropriate competing interests under the following procedure: it must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing.

*Va. Dept. of State Police v. Wash. Post,* 386 F.3d 567, 576 (4th Cir. 2004). A motion to seal cannot rest on conclusory allegations but must "present specific reasons in support of its position." *Id.* at 575.

With respect to the prison incident report, on the record before the Court, Defendants fail to show a compelling government interest that requires the report to be sealed. Defendants rest on the general argument that the documents are protected by "state and/or federal law." (Docket Entry 36.) However, none of the law cited by Defendants clearly establishes a compelling need to seal the documents that outweighs the right to access.

In *Gobble v. Bounds*, 13 N.C. App. 579, 186 S.E.2d 638, *aff'd*, 281 N.C. 307, 188 S.E.2d 347 (1972), the North Carolina court addressed the request of an inmate to make a blanket review of his inmate file to refute allegedly derogatory information pertaining to his right to

29

parole. Relying on N.C. Gen. Stat. §§ 148-74 and 148-76, which address the maintenance of various prison medical records, the court found that prison records are confidential and "not subject to inspection by the public nor inmate concerned."[9] *Gobble*, 13 N.C. at 581, 186 S.E.2d at 639. The court recognized, however, that the confidential information was accessible to those named in the statute, including courts. *Id.* And in contrast to the circumstances presented in *Gobble*, there is no blanket request to view or release Plaintiff's inmate file. The prison incident report is limited in scope and central to the issues presented before the Court. Moreover, some of the facts and information in the report have been openly filed in the record as part of Plaintiff's Response to the Motion for Summary Judgment. (Docket Entry 30-1 at 2-5, 46-55.)

Nor does N.C. Gen. Stat. § 132-1.7 provide a compelling basis to seal the prison incident report. Section 132-1.7 addresses the need to exclude "sensitive public security

---

[9] Section 148-74 provides:

> Case records and related materials compiled for the use of the Secretary of the Department of Adult Correction and the Parole Commission shall be maintained in a single central file system designed to minimize duplication and maximize effective use of such records and materials. When an individual is committed to the State prison system after a period on probation, the probation files on that individual shall be made a part of the combined files used by the Division of Prisons of the Department of Adult Correction and the Parole Commission. The administration of the Records Section shall be under the control and direction of the Secretary of the Department of Adult Correction.

N.C. Gen. Stat. § 148-74. Section 148-76 provides that "[t]he Records Section shall maintain the combined case records and receive and collect fingerprints, photographs, and other information to assist in locating, identifying, and keeping records of criminals. The information collected shall be classified, compared, and made available to law-enforcement agencies, courts, correctional agencies, or other officials requiring criminal identification, crime statistics, and other information respecting crimes and criminals." N.C. Gen. Stat. § 148-76.

information" from public records such as plans or practices of prison facilities and mobile phone numbers of law enforcement. *See* N.C. Gen. Stat. § 132-1.7. However, the incident report and witness statements do not reveal prison plans, disclose state issued cell phone numbers, or otherwise appear to include security details. Defendants fail to explain how the incident report implicates the security concerns of section 132-1.7. Consequently, on the record before the Court, Defendants fail to establish compelling grounds to seal the prison incident report and related witness statements filed as Defendants' Exhibit E.

With respect to Plaintiff's medical records, Defendants assert they must be kept private citing to N.C. Gen. Stat. § 122C-52 and HIPPA. N.C. Gen. Stat. § 122C-52 addresses records maintained in state facilities providing mental health care and states in part that "no individual having access to confidential information may disclose this information." N.C. Gen. Stat. § 122C-52(b). The statute further states that "each client has the right that no confidential information acquired be disclosed by the facility." N.C. Gen. Stat. § 122C-52(c). HIPPA prohibits a person from disclosing "individually identifiable health information." 42 U.S.C. § 1320d-6(a)(3).

There is no blanket exception to the First Amendment right to access for medical records. *See, e.g., Musgrove v. Moore*, No. 1:19-CV-164, 2022 WL 19977408, at *2 (M.D.N.C. Apr. 20, 2022). However, there is an "important governmental interest" in protecting sensitive medical information. *See Fulp v. Columbiana Hi Tech, LLC*, No. 1:16-CV-1169, 2018 WL 1027159, at *10 (M.D.N.C. Feb. 21, 2018). While Plaintiff's medical records contain information relevant to issues before the Court, the records also include highly personal facts about Plaintiff's prior medical history, family background, and family medical history. The

Court finds there is a compelling interest to protect such information. The Court also finds there is no less restrictive way to protect the information than sealing the entirety of the records. *See, e.g., Fulp*, No. 1:16-CV-1169, 2018 WL 1027159, at *10. Interested parties have had an opportunity to object to the request to seal the documents, and nobody has done so. Consequently, Defendants' Motion to Seal is granted with respect to Plaintiff's medical records filed as Defendants' Exhibit F. (Docket Entries 25-1 at 38-53, 35-1 at 38-53.)

Lastly, the Court considers the Motion to Seal insofar as Defendants seek to seal the unredacted Memorandum in support of the Motion for Summary Judgment. A review of the redacted copy of the Memorandum shows that Defendants have redacted language in the Memorandum that summarizes portions of Plaintiff's medical records. (*See* Docket Entry 34 at 3, 5, 15, 16, 17.) However, Defendants fail to show a compelling interest to support sealing or redacting their Memorandum. In contrast to the actual medical records which include details about Plaintiff's broader medical history and personal family background, the medical information referenced in the Memorandum pertains only to matters central to the issues before the Court. Defendants in most cases summarize the information, thereby avoiding some of the most personal facts contained in the medical records. Moreover, some of the information Defendants seek to protect has already been referenced in Plaintiff's arguments in opposition to the Motion for Summary Judgment. (*See* Docket Entry 30.) Consequently, Defendants fail to show a compelling interest that supports sealing their Memorandum, and the Motion to Seal is denied with respect to the Memorandum in support of the Motion for Summary Judgment.

Case 1:23-cv-00373-TDS-JLW   Document 37   Filed 10/04/24   Page 32 of 33

## IV. CONCLUSION

For the reasons stated herein,

**IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry 24) be **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal Memorandum in Support of Defendants' Motion for Summary Judgment (Docket Entry 36) is **GRANTED in part and DENIED in part**. The Motion to Seal is **GRANTED** as to Plaintiff's Medical Records filed as Defendants' Exhibit F. Accordingly, the Clerk is directed to seal pages 38-53 at Docket Entry 25-1, and pages 38-53 at Docket Entry 35-1. Defendants' Motion to Seal is otherwise **DENIED**, and the Clerk is directed to unseal the following documents: Docket Entries 25; 25-2; 25-3; 25-4; 25-5; 25-6; 35; 35-2; 35-3; 35-4; 35-5; and 35-6. The Clerk is also directed to unseal pages 1-37 at Docket Entry 25-1, and pages 1-37 at Docket Entry 35-1.


　　　　　　　　　　　　　　/s/  Joe L. Webster
　　　　　　　　　　　　　United States Magistrate Judge


October 4, 2024
Durham, North Carolina